IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA            Case No. 8:21:cr-00269-WFJ-AEP

vs.

RALPH PUGLISI,
_____/

## DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE

COMES NOW, the Defendant, Ralph Puglisi, by and through his undersigned attorney and submits this sentencing memorandum to assist the Court in resolving certain sentencing issues and in imposing a sentence. The sentencing request contained herein calls for the imposition of a sentence which is no greater than necessary and is sufficient to achieve the purposes enumerated 18 U.S.C § 3553 (a). Ralph Puglisi's individual characteristics, background, cooperation, health, payment of restitution, and need for future restitution indicate that the sentence suggested by the Guidelines would be greater than necessary to accomplish the goals of §3553 (a). As such, as provided herein, a downward variance is warranted. 18 U.S.C. § 3553(a). As grounds in support of this Motion for Downward Variance, Ralph Puglisi shows as follows:

## I.     **Procedural Background**

On August 11, 2021, the Government filed a one-count Information in the Middle District of Florida charging Mr. Puglisi with one count of Mail Fraud in

violation of 18 U.S.C.§ 1341. On August 26, 2021, pursuant to a plea agreement, Puglisi entered a guilty plea to the one count Information. Following his guilty plea, Mr. Puglisi was equipped with a monitor and released on home confinement. Puglisi has fully complied with all conditions of his release without any violations in the 13 months that he has been on home detention.

## II.    Guideline Range and Motion for Downward Variance

Pursuant to the plea agreement, Ralph Puglisi is subject to a maximum sentence of 20 years of imprisonment and a fine of $250,000, or twice the gross gain or loss depending on which is greater. Mr. Puglisi is eligible for not more than 3 years of supervision and a special assessment of $100 per felony count. The Presentence Investigation Report ("PSIR") assesses Puglisi at a base level offense of 7 with an increase of 20 levels based on the specific offense characteristics, resulting in an adjusted offense level of 27. The Defendant received two additional 2 level upward adjustments for his role in the offense (leader/organizer and abuse of position of public trust) giving him a total adjusted offense level of 31 (PSIR ¶ 35). After the respective two and one level reductions for Acceptance of Responsibility, Puglisi's total offense level is 28 in the criminal history category of I, resulting in a guideline imprisonment range of 78 months to 97 months (PSIR ¶ 77).

Ralph Puglisi requests this Honorable Court to grant his Motion for a Downward Variance. Specifically, Puglisi requests a downward variance to Zone C which would allow for Mr. Puglisi to receive a sentence of incarceration

followed by a term of home confinement (with the condition that he continue in mental health treatment, to pay restitution, and cooperate with the Government and Victim). The requested sentence is sufficient but not greater than necessary to accomplish the goals of sentencing.

### III.    Analysis of Relevant 18 U.S.C. §3553 (a) Factors

### A. The Nature of the Offense and the Characteristics of the Defendant § 3553 (a)(1):

This Court is given broad command to consider the nature and circumstances of the offense and the history and characteristics of the defendant when determining a reasonable sentence. *Gall v. United States*, 552 U.S. 38 (2007). In as much, the "punishment should fit the offender and not merely the crime". *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011). Although Ralph Puglisi committed a serious offense, there are many mitigating factors that warrant a variance and/or departure from the Guidelines.

1. Nature and circumstances of the offense

The University Medical Services Association (UMSA) is a "non-profit" corporation that assists USF health in billing, collection, and disbursement of funds generated by the medical practice of the USF medical faculty. UMSA is responsible for handing the finances and funds generated by the medical practice of the USF medical facilities. UMSA has the authority to make expenditures to and for the benefit of USF. Although UMSA is a standalone organization

structurally with independent financial operations, its financial results are consolidated with those of USF.

In 2006, Ralph Puglisi began his employment with UMSA in the accounting and finance department, eventually being promoted to the role of Accounting Manager. As Accounting Manager, Puglisi was given possession and authorization to use UMSA credit cards for business related expenditures with little to no oversight. In 2014, Puglisi began utilizing corporate credit cards issued by SunTrust Bank in the name of UMSA outside the scope of UMSA business. Puglisi, who admits to using the credit cards to make unauthorized charges, would create fake journal entries creating the illusion that the charges were related to legitimate UMSA business. Unauthorized charges were made to the UMSA cards included charges for airline tickets, travel and lodging, gifts, home renovations, rental payments, weddings, and contributions to women on an adult website. In total, Puglisi charged approximately $12,800,000 for his personal benefit and the benefit of others. Ralph Puglisi admits to utilizing the UMSA cards for his personal benefit and the benefit of his family. He understands that he was the "gatekeeper" of the UMSA credit cards and acknowledges that but for his conduct the cards would not have been used for unlawful and unauthorized purchases.

Around the time that he engaged in the conduct that resulted in this offense, Puglisi met and began his relationship with Donna McCoy (Puglisi). McCoy, who had three children from a previous marriage, relied on Puglisi to be

the primary source of income for the home. Puglisi believed that in order to keep Donna happy, he would have to provide her with a luxurious lifestyle. So, in addition to using the UMSA credit card for his own personal expenditures, he also used the cards for home furnishing, trips, and gifts for her and her family. In 2018, Donna McCoy as a registered agent, opened Tropical Familia Investment (TFI) - a company that specialized in real estate in the Caribbean. Feeling compelled to help McCoy achieve her dream job of working in International Real Estate, Puglisi and McCoy set up bank accounts, purchased land, and paid salaries and expenses for TFI by use of the UMSA credit cards.

Although Donna appeared to be happy with her lifestyle and her new business, she and Ralph had many issues in their relationship. Despite living together, they lacked the romance, intimacy, and companionship. Due to the intimacy issues, the lack of attention he was receiving in the home, and the deterioration of his physical and mental health, Puglisi turned to the internet for sexual gratification and companionship. With the need for personal attention, he engaged in online relationships with web cam performers who would not only perform for him but would also act as a pseudo virtual girlfriend communicating and interacting with him directly. The internet webcam platform utilized by Puglisi was "MyGirlFund.com" (MGF).

MGF is an adult content provider that contracts with "webcam" performers who engage in explicit, virtual one-on-one contact with members of the website community. Members can "tip" the webcam performers for their service with the

woman receiving a portion of the tip. MGF also provides a platform for the webcam models to directly communicate with their patrons allowing them to engage in a more intimate relationship to drive up the "tips". As compensation, the webcam models received 65%-90% of the "tips". As the service provider, MGF receives 10%-35% off the top of all "tips" given to the performer. *see* http://www.camgirlwiki.com. Most of Ralph Puglisi's transactions were to MGF, with MGF accumulating millions of dollars in fees from the tips.

Stephanie Sahler, a Canadian citizen, was an MGF webcam performer who was involved in a relationship with Puglisi. In addition to performing private webcam shows for him, Sahler used the MGF platform and her personal devices to directly message and communicate with Puglisi. As their relationship progressed offline, Sahler manipulated Puglisi, who she knew had physical and mental health illness, into believing that if he supported her family by "tipping" her outrageous amounts of money that they would eventually be together in the "real world". Sahler told Puglisi about her "rough life", her family's illnesses, her alleged poverty, and her young daughter who she supported as a single mother. Sahler convinced Puglisi that she was in love with him, leading him to believe that they were in an actual relationship. She preyed on and manipulated Puglisi into believing that by paying her millions, she would eventually get out of the "adult industry" and start a better life with him and her family.

In total, Puglisi paid Sahler approximately $6,000,000. In addition to receiving cash compensation from MGF which she placed in investment

accounts, Sahler utilized the UMSA Credit Card for gifts, vacations, travel, and cancer treatment for one of her family members. During their relationship, Puglisi told Sahler about the source of the money she received, specifically that she was being paid with UMSA credit cards. In cooperation with the Government, Puglisi attempted to recover USF's money from Sahler, after he told her that he was subject to a Federal Investigation. Despite knowing of the source of the millions of dollars in payments she received, this case, and the pending civil litigation, Sahler refused to pay back USF. In complete defiance, Sahler indicated that "since she was a Canadian citizen there was nothing the United States could do to her".

In 2018, Ralph Puglisi was approached by his then son-in-law and his fiancé Francesca Roman about how they could profit from his activity. According to Puglisi, Roman and her fiancé were aware that the money he had was obtained through ill-begotten means. Knowing that the money was "dirty", they inquired as to how they could profit from assisting Puglisi in "moving money". Puglisi and Roman agreed that she would sign up to be a webcam performer on MGF. Through their scheme Puglisi would tip Roman utilizing the UMSA credit cards, with Puglisi keeping 60% of the money she received and Roman keeping 40% (after MGF took their portion). Roman would then utilize the United States Postal Service to deliver checks to Puglisi (including a check in the amount of $18,953.28) as payment for his 60%. In total, Roman personally received in excess of $1,300,000 through the arrangement.

In December of 2020, UMSA terminated Puglisi's employment. A short time later, Puglisi was advised of the investigation. Rather than contesting any of the allegations against him, Puglisi immediately admitted guilt, agreed to cooperate, and asked to be able to pay back USF. Puglisi has cooperated, paid restitution, and accepts full responsibility for his actions. Although his fraud was extensive, Puglisi's criminal conduct was out of character. According to Dr. McClain, his mental health issues and cognitive deficits impacted his behavioral regulation, planning, and anticipating consequences. This most likely affected his ability to regulate his behavior resulting in the present offense. (PSIR ¶ 64).

2.  <u>Acceptance of responsibility, payment of restitution and cooperation with criminal and civil investigations</u>

a.  *Acceptance of Responsibility*

In January of 2021, Ralph Puglisi learned that he was the target of a Federal Investigation regarding his personal use of the UMSA credit cards. Upon being notified of this investigation, Puglisi immediately accepted responsibility and agreed to cooperate with the Government. In meeting with the Government, Puglisi provided cooperation, expressed great remorse for his conduct, and expressed his desire to accept responsibility by pleading guilty to an Information. Upon pleading guilty to the Information, Puglisi admitted to engaging in the criminal conduct as outlined in the plea agreement. Puglisi has continually described how he is remorseful for committing the offense. He is sorry that his actions negatively affected his family, caused financial loss to USF, and violated

the law. Puglisi has learned from this situation, made substantial person changes, vows to pay restitution, and will never be engaged in criminal conduct again.

### b. Cooperation with the Government and USF

Prior to entering his plea, Ralph Puglisi met with Agents in an effort to provide substantial assistance and cooperation. Through a series of proffers, Puglisi provided detailed information related to the commission of the offense, the location of money, and the identity other individuals involved in the criminal activity. He has agreed to do and has done everything that the Government requested of him including pleading guilty, providing testimony, physical evidence, electronic evidence, and paying restitution. Through the pendency of the case, Puglisi has remained in close contact with the Government with the offer to provide assistance in any manner or capacity requested. Although the Government has determined that at this time Puglisi's cooperation does not justify a recommendation for a departure pursuant to 5K1.1, his cooperation should be taken into consideration when fashioning an appropriate sentence.

In addition to cooperating with the Government, Puglisi has taken the extraordinary step to cooperate directly with attorneys representing the University in civil litigation and investigation related to this offense. Through this cooperation, Puglisi agreed to a civil default thereby relieving USF of the litigation directly related to him. In addition to not contesting the civil action, Puglisi has served as a witness and a source of information to the Attorney's representing USF. Puglisi's cooperation with USF resulted in the University

9

amending their civil complaint to include additional facts and named defendants, who without Puglisi's cooperation would have remained unknown. According to the Attorney's for USF, who are extremely pleased with his cooperation, he has been an asset who has provided extraordinary cooperation in the civil litigation.

### c. *Payment of Restitution*

Upon accepting responsibility, Ralph Puglisi expressed his desire to pay restitution. To achieve this, Puglisi depleted all his bank accounts, sold his home, sold his vehicle, sold his memorabilia, and liquidated his retirement/investment accounts. On June 29, 2021, Puglisi signed a "Stipulation Regarding Restitution" in which he formally agreed to the liquidation of assets. (Exhibit A). On August 30, 2021, a Motion and Order to Deposit Pre-Judgment funds was granted and entered. (DKT 19). On August 31, 2021, Ralph Puglisi made a payment in the amount of **$1,212,626.29** to the Clerk of the US District Court as a payment toward restitution. (DKT 21) (Exhibit B). On September 9, 2022, Ralph Puglisi signed a stipulation authorizing the US Marshall to liquidate the **property located in the Virgin Islands** for restitution. (Exhibit C). Finally, on September 19, 2022, Ralph Puglisi made an additional payment of **$20,000** toward restitution. (Exhibit D).

### 3. History and characteristics of the Defendant

Ralph Puglisi was born in Brooklyn, New York in 1962. His mother worked on an assembly line and his father was a truck driver. One of two siblings, Ralph Puglisi was raised in a dysfunctional household in which he, his mother, and

brother were abused physically and mentally by his alcoholic father. (PSIR ¶ 49). Unlike many traditional homes, Puglisi did not receive support or guidance from his father. His mother, who worked to support the family, was essentially his sole caregiver. Puglisi maintains a close relationship with his mother and is her primary caregiver; however, he has not had contact with his father for over 26 years, who his mother divorced after Puglisi graduated high school. (PSIR ¶ 50). During his childhood, Puglisi and his brother were forced to fend for themselves and care for their home. Based in part to him witnessing and being the victim of domestic abuse, Puglisi developed childhood mental illness. This illness resulted in Puglisi having severe anxiety and depression. During high school, Puglisi became an accomplished, varsity athlete playing football, baseball, and basketball. Despite the troubles within the home and mental illness, Puglisi had no disciplinary issues and excelled both academically and athletically.

As a three-sport high school athlete with good grades, Puglisi moved to Jacksonville, Florida to attend college at Jacksonville University with a focus in accounting. He eventually withdrew from JU his sophomore year, moving to Spring Hill, Florida, where he continued taking accounting classes at the college level while gainfully employed. While in Florida, he met his first wife whom he had two children with. The couple eventually relocated to New Jersey, where they raised their children together until they separated. Despite his separation and eventual divorce, Puglisi was involved as a father, often working two jobs to support his family. In 2006, Puglisi relocated to Palm Harbor, Florida with his

second wife, Ida Puglisi. After separating from Ida, he met Donna McCoy who he eventually lived with until the discovery of this offense.

Puglisi has maintained steady employment through his adult life. In July of 2006, Puglisi gained employment with UMSA in their Finance and Accounting Department. Prior to working at UMSA, Puglisi worked in a similar capacity at Centra State Medical Center in New Jersey. (PSIR ¶ 74) Prior to the offense, Puglisi was a model employee who was respected and liked by coworkers, supervisors, and staff. While at UMSA, Puglisi who was on a promotion track, received bonuses, and recognition for his hard. According to his supervisors, Puglisi was very knowledgeable in his position, produced an excellent quality of work, and was customer service oriented, maintaining a great relationship with individuals in and outside of the organization. Puglisi was described in reviews as a "great leader", the "go to person" for questions, and an "effective problem solver". (PSIR ¶ 71).

After being terminated by USF, Puglisi sought employment wherever he could find it. Although it was not easy based on this conviction, he managed to gain employment and remains currently employed. Having hit "rock bottom", losing his six-figure job with UMSA, being a convicted felon, and facing the shame of a very public criminal case, Puglisi gained employment at a Dollar General making $10 per hour. Recently Puglisi was hired at a Walmart as a front-end employee making $2,080 each month. Of the roughly $2,000/ month that he brings home, Puglisi set aside $1,000 which was paid toward restitution prior to

sentencing. If given the opportunity, he will continue to work to make monthly restitution payments.

Despite the external appearance that his life was under control, internally, Puglisi was dealing with mental illness that resulted in a downward spiral. Puglisi's mental illness, which was caused in part from his abuse as a child, was exasperated by a traumatic brain injury he suffered as a result of an automobile accident in the 1990's. The TBI suffered by Puglisi had a direct effect on his mood, perceptions, processing, decision making, impulse control, and behavior. After learning of the investigation, Donna McCoy, Puglisi's family, and her family abandoned him. Having lost his family, job, and facing the loss of his freedom, Puglisi unsuccessfully attempted suicide. After his release from a "Baker Act", Puglisi engaged in a new regiment of treatment which included psychological counseling and medication. (PSIR ¶ 62) Puglisi has vowed to make the best of his life, continue in his treatment, work toward paying restitution, caring for his mother, and being a productive member of society. According to Dr. McClain, Puglisi has been stabilized in his treatment, which he will continue to engage in.

Prior to his guilty plea, Puglisi moved into the home of his mother, Assunta Puglisi, becoming her primary caregiver. Puglisi's mother moved to Florida approximately 15 years ago after falling and breaking her hip. Due to her serious and deteriorating medical condition which resulted in her being placed in hospice care in the past, Puglisi is her primary caregiver. As her primary caregiver, Puglisi is responsible for providing his mother with her daily needs such as bathing,

cooking, cleaning, and hygiene. Puglisi has a close relationship with his mother, who despite his conduct supports him. Puglisi's elderly mother would be collaterally affected by his incarceration and would most likely not survive to see him released. (Exhibit E)

In the time that has passed since the inception of the investigation, Puglisi has been a model citizen and releasee. Since entering his guilty plea on August 26, 2021, Puglisi has been confined on "home detention". He has had no new law violations, achieved gainful employment, and continued to pay restitution. He has managed his mental health through treatment including medication, counseling, and hyperbaric therapy. He accepted responsibility, entered a guilty plea to an Information, and paid an exorbitant amount of restitution. Puglisi has engaged in his best efforts to cooperate with the Government and USF in their Civil Litigation related to this offense. His compliance with the conditions of release, his history and character, the regulation of his mental health, his positive adjustment while on pretrial service and his desire, willingness, and ability to pay restitution should be considered when fashioning an appropriate sentence. (PSIR ¶ 95). see, e.g., *United States v. Huckins,* 529 F.3d 1312 (10th Cir. 2008) (affirming downward variance in possession of child pornography case based on defendant's lack of significant criminal history, depression at the time of the offense, lack of repeat offending by the defendant after his arrest, significant self-improvement efforts during while he waited to be prosecuted).

**B. The Need for the sentence imposed § 3553(a):**

1.  <u>The need to reflect the seriousness of the offense promote respect for
    the law and provide a just punishment § 3553(a)(2)(A)</u>

A sentence below the Guideline range would effectively reflect the
seriousness of the offense, promote respect for the law, and provide just
punishment. The purposes of § 3553 (a)(2)(A) are referred to as "retribution"
which is generally assessed according to two elements: the nature and
seriousness of the crime caused or harm threatened, and the defendant's degree
in culpability in committing the crime. Richard S. Frase, *Excessive Prison
Sentences, Punishment Goals and the Eighth Amendment: "Proportionality"
Relative to What"*, 89 Minn. L. Rev. 571, 590 (February 2005). Thus, the
seriousness of the offense may be lessened if the crime was non-violent. *see* 28
U.S.C. § 994 (j). In Puglisi's case, the seriousness of his offense is mitigated by his
cooperation with the Government and USF directly, lack of prior offenses, and
payment of restitution. The seriousness of the offense should also be mitigated
considering his willingness and actual payment of restitution versus the other
individuals and corporations that refuse to pay restitution.

The consequences that Puglisi has suffered provide for a just punishment
for his criminal activity and as such any extended period of incarceration would
amount to a punishment beyond what is just. Puglisi has suffered the loss of his
employment, his professional reputation, his family, and many of his civil rights.
Puglisi understands that for the rest of his life, he will be indebted to USF. Any

money that he would ever make will go to pay restitution to USF. Knowing that

he is working solely to support his minimalist lifestyle and pay restitution to USF

is a punishment. These collateral consequences suffered by Puglisi would justify a

downward departure or variance. *see, e.g.*, *United States v. Gaind*, 829 F. Supp.

669, 671 (S.D.N.Y. 1993*); United States v.Vigil*, 476 F. Supp. 2d 1231, 1235

(D.N.M. 2007) (finding variance appropriate where defendant was collaterally

punished by loss of his position and reputation, widespread media coverage, and

emotional toll of two lengthy public trials); *United States v. Samaras*, 390 F.

Supp. 2d 805, 809 (E.D. Wis. 2005)

2. <u>The need to afford for adequate deterrence and to protect the public</u>
<u>§ 3553(a)(2)(B-C)</u>

Ralph Puglisi is a first-time offender, convicted of a non-violent offense. A

Court may vary downward based on his low risk of recidivism. *United States v.*

*Ross*, 557 F. 3d 237 (5th Cir, 2009). There is no empirical evidence that suggests

sentence length has a deterrent effect on future crime. Michael Tonry, *Purposes*

*and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29

(2006). The Sentencing Commission has found that there is no correlation

between recidivism and Guideline offense levels; thus, an offender with a low

guideline range and one with a high guideline range would have the same rate of

recidivism. US Sentencing Commission, *Measuring Recidivism: The Criminal*

*Computation of the Federal Sentencing Guidelines*, at 15 (May 2004).  In fact,

the offender with the lowest rate of recidivism is one who receives probation and

fines only. *Id.* at 13., see also US Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview*, at 22 (March 2016).

Ralph Puglisi has an extraordinarily low statistical likelihood of recidivism. Generally, Defendants convicted of Fraud have a low statistical likelihood of reoffending (4.9%). *Id.* at 17. As a first-time non-violent offender, like Puglisi, they have the lowest likelihood of all classes of Federal Defendants to re-offend. US Sentencing Commission, *Measuring Recidivism: The Criminal Computation of the Federal Sentencing Guidelines*, at 13 (May 2004). When including all of the factors, such as his education, age, no history of drug use, and lifelong employment, he shows an even lower probability of re-offending. *Id.* As such, the Court would be justified in granting a downward variance especially when considering his charge, criminal history, and the fact that defendants sentenced to probation as opposed to prison reoffend the least. *see e.g. United States v. Darway,* 255 Fed. Appx. 68, 73 (6th Cir. 2007); *United States v. Hamilton*, 323 Fed. Appx. 27, 31 (2d Cir. 2009); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007). When considering the Commission's reports on recidivism, the nature of this nonviolent offense, his payment of restitution, and the cooperation he offered, it is extremely unlikely that he will commit any future crimes. Therefore, the public is protected from the Defendant. As such, no term of imprisonment is necessary to prevent Puglisi from committing any crimes in the future.

3. The need for medical treatment is the "Most Effective Manner" § 3553(a)(2)(D)

The sentence imposed must ensure that "needed...medical care is provided in the most effective manner". 18 U.S.C. § 3553(a)(2)(D). The sentencing commission recognizes that physical condition may be relevant when determining if a departure is warranted. USSG § 5H1.4 p.s. Courts have considered various circumstances in which a departure was warranted based on a physical or medical condition. *see e.g. U.S. v. Alemenas*, 553 F.3d 27 (1st Cir. 2009): *U.S. v. Kemph*, 2009 WL 667413 (4th Cir. March 13, 2009); *U.S. v. Duhon*, 541 F.3d 391 (5th Cir. 2008); *U.S. v. Martin*, 363 F. 3d 25 (1st Cir. 2004). Ralph Puglisi's age and physical condition justify a departure for variance. see USSG § 5H1.1 (Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration); USSG § 5H1.4 (Physical condition . . .may be relevant in determining whether a departure is warranted if the condition . . . is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines.). Here, Puglisi's age and physical condition disproportionately increases the impact of incarceration.

Ralph Puglisi is 60 years old with several health conditions. Puglisi is at an age where his medical conditions will invariably get worse. *U.S. v. Willis*, 322 F. Supp. 2d 76 at 84 (D. Mass 2004). Only 3.1% of federal offenders are over 60 years old and Mr. Puglisi is in that age range. U.S. Sentencing Comm., *2018 Annual Report and Sourcebook of Federal Sentencing Statistics*. Even less

offenders are like Puglisi, a 60-year-old with compound chronic health conditions. Puglisi's age and medical conditions put him far outside of "the typical cases covered by the guidelines." USSG § 5H1.4; *United States v. Chase*, 560 F.3d 828, 830–31 (8th Cir. 2009). The Commission has recognized the advisability of revising the guidelines to take age and first offender status into account, which has determined that age "may be relevant" in granting a departure. USSG § 5H1.1, p.s. The fact that Puglisi is elderly and infirm indicates the existence of alternatives to long term confinement that would still meet the goals of sentencing.

Puglisi suffers from many physical conditions in which he requires specialized treatment. As mentioned above, in the 1990's, Puglisi was involved in a serious automobile accident that resulted in a Traumatic Brain Injury (TBI). This TBI effected Puglisi physically and mentally. To treat the TBI, Puglisi is a patient with the AMEN Clinic in Atlanta, Georgia. Brain scans reveal that he suffers from significant injuries to multiple parts of his brain. This brain injury directly affects Puglisi's cognitive ability, behavior, and overall mental health. Treatment for the TBI includes a regiment of medication, interval training, cognitive behavioral therapy, and hyperbaric chamber therapy. In September of 2021, Puglisi was reevaluated by the AMEN clinic who recommended that he complete twenty additional hours hyperbaric therapy. (PSIR ¶ 59) The treatment for his TBI is costly, complex, and not offered by the BOP. Puglisi also has multiple physical conditions, which require specialized treatment. Puglisi suffers

19

from osteoarthritis in his spine, knees, and hands as well as a degenerative spine. He has undergone several knee surgeries and two hip surgeries. He also suffers from Hammer Toe, Bilateral Metatarsalgia, and callous feet. These disorders require constant medical attention and eventually surgical intervention. He sees a podiatrist once every six weeks to treat his foot disorders. Without this treatment, Puglisi would be unable to walk. (PSIR ¶ 58)

Puglisi has been diagnosed with multiple mental illnesses including anxiety, depression, major depressive disorder, panic attacks, mood instability, major depressive disorder, ADHD, PTSD, Neurocognitive Disorder, and bipolar disorder. (PSIR ¶¶ 62-64) As a result of these many issues, Puglisi suffers from weight loss, insomnia, panic attacks, anxiety, mood instability, and depression. He has been receiving treatment under the care of Sharon Krieger for these mental health disorders, which includes therapy and medication. (PSIR ¶ 62) He is currently prescribed multiple narcotic and non-narcotic medications. (PSIR ¶ 62) Many of these medications and mental health services are not offered in the BOP. Puglisi is dependent on these medications, and it is essential that he continues to receive them to maintain his mental stability.

Continued care including therapy and medication is needed to treat Puglisi's physical and mental deficiency and provide stability to his mental health. According to Dr. McClain, Puglisi's chronic mental health issues and cognitive defects present challenges to his ability to maintain emotional function and stability. He would benefit from continued mental health services including

20

medication management and counseling to address these issues, provide coping skills, and decrease his depression and anxiety. Many of these services and medications are not offered by the BOP. Since being placed on this regiment, Puglisi has stabilized and been a productive member of society. His conditions, amenability to treatment, continued treatment, and remorse for his actions are evidence that a sentence that provides for physical and mental treatment is the "most effective means".

### 4. The Need to Provide Restitution, §3553 (a) (7)

The extraordinary amount of restitution paid by Ralph Puglisi prior to sentencing and the need to pay additional restitution to the victims provides the Court with a basis for a downward variance. 18 U.S.C. § 3553(a)(7). *States v. McBride*, 434 F.3d 470, 476 (6th Cir. 2006) *United States v. Mickelson*, 433 F.3d 1050, 1055 (8th Cir. 2006); *see* also, e.g., *U.S. v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006). Federal restitution is rarely collected prior to sentencing, especially in the amount already collected in this case. *see* United States Government Accountability Office, Federal Criminal Restitution, Most Debt Is Outstanding and Oversight of Collections Could Be Improved (2018). Given these facts, Puglisi's repayment of restitution significantly differs from a large percentage of cases and is extraordinary. It is highly unusual for such a large debt to be recovered in a truly short amount of time. His voluntary payment of a substantial amount of money prior to sentencing is exceptional.

In *United States v. Kim*, 364 F.3d 1235 (11th Cir. 2004), a husband and wife who participated in a scheme to defraud a federal food stamp program liquidated assets and took on a tremendous amount of debt to repay restitution prior to sentencing. *Id*. at 1239-40, 1244. Granting a substantial downward variance, the District Court sentenced the Defendants to probation with home confinement due in part to their extraordinary efforts to pay restitution. *Id*. at 1239. In affirming the District Court's variance, the Eleventh Circuit held that the courts may consider "extraordinary restitution as a basis for downwardly departing from the sentencing guideline". *Id*. at 1242. Although the Eleventh Circuit declined to create bright line rule, it found that "courts have looked to a wide range of factors, such as the degree of voluntariness, the efforts to which a defendant went to make restitution, the percentage of funds restored, the timing of the restitution, and whether the defendant's motive demonstrates sincere remorse and acceptance of responsibility." *Id*. at 1244.

Puglisi undertook a great effort to raise the funds to pay restitution including the sale of his home, the sale of his personal belongings and memorabilia, the liquidation of his investment accounts, the sale of his car, and the liquidation of all his bank accounts. To date, Ralph Puglisi has repaid restitution to UMSA, the University of South Florida's University Medical Services, in the amount $1,212,626.29, turned over his interests in a property in the Virgin Islands valued at approximately $400,000, and made an additional payment in excess of $20,000 from money he earned while working after his

22

plea. When applying the analysis and factors in *Kim*, the circumstances here weigh in favor of variance. Specifically, Puglisi voluntarily paid restitution before sentencing without any promise, requirement, or benefit with "no assurance" that his restitution efforts will be rewarded by the District Court at sentencing. *Id*. at 1245–46.

Ralph Puglisi requests that this Honorable Court to take into consideration the restitution he paid in light of how much he actually received. The total loss to the victim in this case is approximately $12,860,000. According to their internal audit, USF calculates that the payments made to Mygirlfund.com totaled $11,487,433. Of the over $11 million paid, the website took on average approximately 20% ($2,297,486) "off the top" with the webcam performers taking approximately 80% ($9,189,946). *see* University of South Florida Investigative Report, April 9, 2021, page 7. As such, it appears that MGF profited more from the scheme than Ralph Puglisi did. MGF, who was a conduit for most of the fraud, did nothing to stop Puglisi from charging almost $11.5 million to an UMSA credit card. In fact, the money paid to MGF by Puglisi accounted for more than 80% of all MGF profits for the time period. Despite knowing the nature of the case, being subject to a civil suit, and arguably acting "willfully blind" to the source of the funds, MGF has not accepted responsibility and has not paid any money back to USF.

Of the webcam performers, Stephanie Sahler profited the most, taking over approximately $6,000,000 (Puglisi concedes that she sent him approximately

$200,000). Through his cooperation, Puglisi made efforts to contact Sahler to return the money that she took; however, unlike Puglisi, she refused to pay USF. Included in the amount paid to Mygirlfund.com is the amount paid to Fran Roman of which she took $1.3 million dollars (after MGF took their portion, Roman.)  Unlike Puglisi, Roman, who laundered money from USF and directly profited from the scheme, refused to pay back the money that she took, knowing the nature of this case and investigation.

Despite all of those who benefited from the scheme, Puglisi is the only one who has accepted responsibility and paid any money back. When considering the $1,232,626.29 paid in restitution and the value of the property currently being sold by the Government, Puglisi has personally paid back almost all that he received. In order to repay as much as possible, he sold his house, vehicles, liquidated every asset, sold memorabilia, moved in with his mother and brother, and works the best job that he could find given the circumstances to continue to pay restitution. Ralph Puglisi acknowledges that what he did was wrong and has made steps to pay back the victims. Although he has paid back much of which he received, Puglisi knows that he will be required to pay restitution until USF is made whole. When considering the phrase "extraordinary," "there is no requirement that the circumstances be extra-ordinary by any particular degree of magnitude." *United States v. Dominguez*, 296 F.3d 192, 195 (3d Cir. 2002). Rather, the court must simply identify facts that make this case different from the usual case. *United States v. Norton*, 218 F. Supp. 2d 1014, 1019 (E.D. Wis. 2002).

Puglisi is the rare Defendant, who has demonstrated extraordinary remorse and acceptance of responsibility, by making extraordinary restitution payments. *Kim*, 364 F.3d at 1245.

### IV.    CONCLUSION

The Defendant, **Ralph Puglisi**, respectfully requests that the Court grant the Defendant's Motion for a Downward Variance. Puglisi is a non-violent first-time offender with multiple medical conditions. He demonstrated a positive adjustment on release and has a low likelihood of reoffending. He cooperated with the Government and the victim and paid an extraordinary amount of restitution. As such, a downward variance as requested would be sufficient, but not greater than necessary to achieve the goals of 18 USC § 3553(a).

Respectfully Submitted,

/s/ Anthony B. Rickman
ANTHONY B. RICKMAN, ESQUIRE
FL. BAR No. 13904
The Rickman Law Firm
400 North Ashley Drive Suite 2100
Tampa, Florida   33602
(813) 999-0502
ARickman@therickmanlawfirm.com

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of Court by using CM/ECF System which will send a Notice of Electronic Filing to Jay G. Trezevant, Assistant United States Attorney, 400 North Tampa Street, Suite 2100, Tampa Florida